IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Harriette Anne Taylor, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br><br>Defendant. )<br>_____) | Civil Action No. 6:14-3407-MGL -KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on February 10, 2006, alleging that she became unable to work on August 12, 1999. The applications were denied initially and on reconsideration by the Social Security Administration. On December 26, 2006, the plaintiff requested a hearing. At the hearing, the plaintiff amended her alleged onset date to February 10, 2006, and withdrew her application for DIB. The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, Ph.D., an impartial vocational

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

expert, appeared on August 26, 2008, considered the case *de novo*, and on September 22, 2008, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on March 11, 2011.

The plaintiff filed an action for judicial review on May 12, 2011.  On April 20, 2012, the defendant moved this court to enter a judgment with an order of reversal and remand of the cause to the Commissioner for further administrative proceedings.  The case was remanded on May 22, 2012, and, pursuant to the district court's remand order, the Appeals Council directed the ALJ to:  (1) further consider the plaintiff's RFC, (2) reevaluate the medical opinions of record, (3)  if warranted, obtain additional VE testimony, (4) offer the plaintiff the opportunity for another hearing, and (5)  issue a new decision (Tr. 479-80).

On February 1, 2013, a different ALJ held an administrative hearing during which the plaintiff and John S. Wilson, an impartial vocational expert, testified (Tr. 431-52). On April 25, 2013, the ALJ issued a decision finding the plaintiff was not disabled under the Act (Tr. 414-30).  On June 24, 2014, the ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council.  This appeal followed.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2003.

(2)    The claimant has not engaged in substantial gainful activity since August 12, 1999, the alleged onset date (20 C.F.R § 416.971 *et seq*.).[2]

---

[2]The ALJ acknowledged in the decision that the plaintiff amended her alleged onset date to February 10, 2006 (Tr. 417).

(3)    The claimant has the following severe impairment: cervical radiculopathy (20 C.F.R. § 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to:  sit, stand, and walk each for 6 hours of an 8-hour day; frequently lift/carry 10 pounds; occasionally lift 20 pounds; never climb or crawl; occasionally perform overhead reaching; and never be exposed to hazards.  She would also require a sit/stand option at will.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. § 416.965).

(7)    The claimant was born on October 1, 1959, which is defined as a younger individual age 18-49, on the alleged disability onset date.  The claimant subsequently changed age category to closely approaching advanced age (20 C.F.R. § 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could have performed (20 C.F.R. § 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined the Social Security Act, from August 12, 1999, through the date of this decision (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 46 years old on her amended alleged disability onset date and 53 years old when the ALJ issued the decision (Tr. 129, 434, 488).  She graduated from high school (Tr. 163, 435) and previously worked as an industrial cleaner, cashier, balancing clerk, and food service worker (Tr. 160, 168).

During the period under review, the plaintiff lived in a home with her family, including her sister, mother, and son (Tr. 191, 434, 488).  She cared for her personal needs and grooming independently, except a friend helped her care for her hair (Tr. 192).  She prepared simple meals daily; performed light housework, such as loading the dishwasher; rode in a car; drove, albeit not often; shopped in stores for groceries twice a month; watched television; handled her finances; and spent time with her family (Tr. 193-95).

The plaintiff has a history of neck, right shoulder, and arm pain that pre-dates her amended alleged disability onset date.  Beginning in 1997, she attended routine office visits at the Medical University of South Carolina ("MUSC") for various medical conditions, but received only limited treatment for pain complaints (e.g., she attended only two office visits in 2003).  Her providers prescribed massage, a Lidoderm patch, and pain and muscle relaxant medications (Tr. 226-27).

On March 20, 2006, the plaintiff sought treatment for bilateral arm pain at MUSC.  At the time, she was taking Elavil, which she reported made her slightly less anxious and reduced her pain.  On examination, the plaintiff was pleasant with clear lungs, a regular heart rate and rhythm, a normal abdomen, and full passive range of motion in both arms, although she grimaced in pain when she moved them above her head.  She requested a referral to Kerry Kolehma, M.D., of Coastal Physical Medicine, whom she had

6

been treated by in the past.  Terrence Steyer, M.D., made the referral and continued the Elavil prescription (Tr. 245).

At an office visit with Dr. Kolehma on March 27, 2006, the plaintiff exhibited 5/5 bilateral arm strength, reduced neck range of motion, decreased sensation in the C6-C7 dermatome, and spasms in her left upper trapezius and rhomboid.  Dr. Kolehma assessed the plaintiff with cervical spondylosis with radicular pain into left arm, with possible myofascial pain component.  Dr. Kolehma recommended oral steroids, a Lidoderm patch as needed, and an MRI.  Dr. Kolehma also reported that the plaintiff's past medical history was significant for cervical spondylosis, most severe at C5-6 with involvement of the left C6 nerve root, per MRI dated 2002.  The plaintiff's examination was positive for cervical extension decreased 50%, flexion 20%, and left lateral rotation and bending 50% (Tr. 284).

A March 29, 2006 cervical spine MRI revealed mild degenerative disc disease, worse at C5-C6, and posterior longitudinal ligament hypertrophy at C5-C6 and C6-C7 (Tr. 223, 290).

On April 24, 2006, a motor, sensory, and electromyography ("EMG") study revealed no electrodiagnostic evidence of C6 radiculopathy and mild carpal tunnel syndrome on the plaintiff's left side (Tr. 288-89).

When seen in follow-up by Dr. Kolehma on May 3, 2006, the plaintiff complained of increased pain in her left cervical area, and she exhibited severe spasms during a limited examination (Tr. 286).

On May 24, 2006, the plaintiff attended a consultative examination with Mary Lang, M.D., at the state agency's request (Tr. 291-94).  She reported that she was unable to work due to severe neck pain that radiated into her left arm, but admitted that she performed all activities of daily living, including cooking, shopping, and handling her finances (Tr. 292).  On examination, the plaintiff had a normal gait, including toe walking, heel walking, and tandem gait; reduced cervical, right shoulder, and lumbar range of

7

motion; slow but intact coordination; 4/5 motor strength in most areas; and a normal mental status (Tr. 292-93).  Based upon her examination, Dr. Lang made diagnoses of cervicalgia, neuralgia, neuritis, and radiculitis, unspecified (Tr. 294).

On May 31, 2006, the plaintiff told Dr. Kolehma that she was caring for her 86-year-old aunt and her 16-year old son, who was in trouble, and that she felt very stressed because "everything falls on her" (Tr. 286).  She denied relief with steroids (*id*.). The plaintiff exhibited reduced cervical spine range of motion, upper trapezius spasms, normal left shoulder flexion, and normal sensation in her arms.  Dr. Kolehma noted that stress exacerbated the plaintiff's pain and prescribed a muscle relaxant (*id*.).

In June and October 2006, respectively, state agency physicians Charles Fitts, M.D., and William Hopkins, M.D., independently reviewed the record and opined that the plaintiff retained the physical ability to perform a modified range of medium work (Tr. 295-303, 344-51).  Both of these physicians indicated that there were no treating or examining source statements in the plaintiff's file regarding her physical capabilities for their review at the time that they rendered their assessments (Tr. 302, 350).

In a "Psychiatric Review Technique" form dated October 20, 2006, Judith Von, Ph.D., opined that while the plaintiff exhibited some mild depression, this condition only imposed mild limitations in her mental functioning and therefore did not constitute a severe impairment (Tr. 330-42).

The plaintiff saw Dr. Kolehma again on December 4, 2006.  Her examination was positive for hypersensitivity in the left tricep area and spasms and pain in the cervical spine.  She reported she recently had been hospitalized for an acute episode of hyperthyroidism and complaining of burning pain under her left arm (Tr. 362).  Dr. Kolehma continued the plaintiff's prescription for muscle relaxants and prescribed a trial of Lidoderm patches (*id*.).

8

In February 2007, the plaintiff told Dr. Kolehma her neck pain was not as severe and seemed preoccupied with her thyroid; she also complained of numbness in both hands, left worse than right (Tr. 363). The plaintiff exhibited 2+ and equal deep tendon reflexes bilaterally, decreased sensation along the C5/6 dermatome, and a positive Tinel's sign (*id*.). Dr. Kolehma recommended further studies to evaluate carpal tunnel and continued the Lidoderm patches for her neck pain complaints (*id*.).

In March 2007, electrodiagnostic tests of the plaintiff's arms were normal and revealed no evidence of radiculopathy, carpal tunnel syndrome, or peripheral neuropathy (Tr. 365). That month, the plaintiff complained about headaches and neck pain, but reported improvement in her arm numbness (Tr. 366). She exhibited restricted cervical range of motion, a tender occipital area, and guarding in her upper trapezius. Dr. Kolehma discussed physical therapy and injections, which the plaintiff declined (*id*.). The plaintiff had no other treatment with Dr. Kolehma in 2007.

From late 2006 through April of 2008, the plaintiff received treatment at MUSC on a regular basis, primarily for management of hyperthyroidism (Tr. 373-409). She complained of right arm pain at only two visits (Tr. 402, 405-06). With the exception of an enlarged thyroid, her examiners generally documented unremarkable physical examination findings at every visit, including that the plaintiff had a normal gait, normal muscle strength, intact sensation, normal deep tendon reflexes in her arms and legs, intact cranial nerves, intact coordination, full range of motion in her extremities, and normal muscle tone and mass (Tr. 374, 377-78, 382, 385, 388, 391, 395, 398-99, 402, 405, 408).

In July 2008, over one year after her last visit, the plaintiff returned to Dr. Kolehma complaining of "pain all over," especially in her left shoulder; she admitted she had run out of the medications that helped her muscle spasms (Tr. 368). Dr. Kolehma noted that it was a "difficult exam" since the plaintiff was not fully participating (*id*.). Despite some tenderness and decreased sensation in the C5/6 distribution on her left side, the plaintiff

9

displayed full active range of motion in her shoulders with some pain and a negative Spurlings sign. Dr. Kolehma continued the plaintiff's muscle relaxants and recommended an MRI study (*id*.).

In August 2008, electrodiagnostic testing of the plaintiff's arms performed by Dr. Kolehma revealed evidence of denervation in her left bicep "or maybe isolated finding" for which MRI correlation was recommended (Tr. 371). Otherwise, testing revealed that the plaintiff's bilateral ulnar, radial, motor, and sensory nerves were normal (*id*.). The plaintiff had no further treatment with Dr. Kolehma.

On August 20, 2008, Dr. Kolehma completed a "Physical Capacities Evaluation" indicating that the plaintiff could sit for eight hours, stand for four hours, and walk for two hours during an eight-hour day; could rarely lift and/carry up to ten pounds; could not push or pull repetitively; could perform some postural activities occasionally; could never climb or place her hands above shoulder level; and could not tolerate exposure to heights, noise and vibration, and temperature extremes (Tr. 353-54). Dr. Kolehma further reported that the plaintiff would miss up to four days of work per month and could not sustain a full time work schedule. Dr. Kolehma stated that "Patient Has L C-5 Radiculopathy - Symptoms, MRI & EMG correlate" and that the plaintiff should avoid extensions of her neck and twisting and turning of her neck (Tr. 355).

The plaintiff received no medical care over the three-year period between September 2008 and September 2011.

In October 2011, she returned to MUSC for a general medical examination during which she exhibited unremarkable examination findings (Tr. 577-81). The examining provider described her radiculopathy as "stable," and the plaintiff agreed to try over-the-counter Tylenol to address it (Tr. 580).

In January 2013, the plaintiff returned to MUSC for a routine office visit (Tr. 587-90). The examiner documented normal findings, including that the plaintiff had normal

muscle tone, normal coordination, normal reflexes, and no cranial nerve deficit (Tr. 589). To address the plaintiff's cervical radiculopathy, the doctor refilled a prescription for a muscle relaxant and recommended over-the-counter Ibuprofen (*id*.).

***Administrative Hearing - August 26, 2008***

In response to questioning by the ALJ, the plaintiff testified that she was experiencing a constant throbbing pain in her neck that radiated into and caused numbness in her arms (Tr. 34). She indicated that her neck would lock up at times with sudden movements and that while she had been prescribed Tinanzidine and Amitriptyline for her discomfort, these medications made her drowsy (Tr. 34-36). She testified that she had undergone extensive treatment consisting of injections, physical therapy, and medication, but that none of her treatment had helped to any extent (Tr. 41). She also stated that the symptoms in her left arm were worse than her right (Tr. 42).

The plaintiff testified that she was experiencing severe headaches several times a week in connection with her neck problems, which often lasted all day (Tr. 42). As a result of the symptoms in her neck and upper extremities, the plaintiff testified that she can only walk for 30-40 minutes at a time and sit for only 1½ - 2 hours at any one time. (Tr. 38). She also indicated that she had trouble lifting and that while she was able to lift a gallon of milk, she could not lift it by the handle, but rather had to cuddle it (Tr. 39). The plaintiff also indicated that she had very weak grip strength in both of her hands and had a hard time reaching overhead and that it was also difficult for her to perform such activities as bending, stooping or reaching. She further testified that her pain made it difficult to concentrate and caused her to be confused and angry. (Tr. 44-45).

The plaintiff testified that she had also been receiving ongoing treatment at MUSC for a thyroid condition that had been diagnosed several years earlier (Tr. 43). She indicated that her thyroid condition causes her to experience severe sweating and fatigue and that she is also very sensitive to heat (Tr. 43). Overall, she indicated that her medical

problems made it difficult for her to sustain any physical activity for more than an hour or two at a time (Tr. 44).

***Administrative Hearing - February 1, 2013***

At her second hearing, the plaintiff testified that she had never worked in a job in an office setting or where she was not required to stand most of the day (Tr. 436-37). She testified that she had been treated for approximately ten years by Dr. Kolehma for headaches and neck pain that radiated into her arms and that she had been diagnosed with spondylosis and radiculopathy (Tr. 437). She testified that she had undergone an EMG/nerve conduction study that revealed that she had nerve damage, and she stated that she was experiencing muscle spasms on some occasions when she was examined by Dr. Kolehma (Tr. 438). The plaintiff further indicated that although Dr. Kolehma had referred her for an MRI, she was unable to undergo the scan since she lost her Medicaid when her son turned 18 and that the lack of insurance coverage also prevented her from having any further evaluations recommended by Dr. Kolehma.

The plaintiff testified that her condition had not improved since her first hearing in 2008. She testified that she was experiencing constant pain in her left arm and tingling in her right hand and that she was continuing to experience muscle spasms (Tr. 440). The plaintiff further testified that in addition to her neck and arm symptoms, she was also experiencing pain, stiffness, and fatigue due to her thyroid disorder (Tr. 441-42). Based upon her medical condition, the plaintiff testified that she can only be on her feet from 30 minutes to one hour at any one time and that lying down was her most comfortable position (Tr. 442-43). She indicated that she was only capable of lifting small items in her kitchen and that she also had limited grip strength due to symptoms in her fingers. She further indicated that it was difficult for her to look up and down; reach out or overhead; and perform activities such as bending, stooping and kneeling (Tr. 443-44). She also testified that the Zanaflex she was prescribed by Dr. Kolehma made her drowsy and that the pain

that she experienced also made it difficult for her to concentrate, focus, and stay on task (Tr. 444-45).

The ALJ asked the vocational expert to assume a person of the plaintiff's age, education, and vocational background, who was limited to light work involving no climbing, crawling, or exposure to industrial hazards; no more than occasional overhead reaching; and a sit/stand option at will (Tr. 446). The vocational expert testified that such a person could not perform the plaintiff's past relevant work, but could make a vocational adjustment to a significant number of light, unskilled jobs existing in the national economy, such as ticket taker (105,560 national positions), storage facility clerk (420,070 national positions), and parking lot attendant (126,160 national positions) (Tr. 446).

Upon cross-examination, the vocational expert acknowledged that although the parking lot attendant position was classified by the *Dictionary of Occupational Titles* as light, the physical requirements of this job would allow it to be performed by an individual who was only capable of performing sedentary work (Tr. 449-50). The vocational expert further acknowledged that all jobs in the economy would be eliminated if an individual was off task for 20% or more of a workday; needed to take breaks or rest periods on an unpredictable and unscheduled basis; and was absent from work for more than four days per month (Tr. 451).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) failing to properly reevaluate the medical source opinions as instructed by the remand order, (2) improperly relying on the vocational expert's testimony, and (3) finding that the plaintiff was not disabled because the defendant did not carry the step five burden of proof to show that there are a significant number of jobs that the plaintiff can perform in the national economy (pl. brief at 1).

The plaintiff first argues that the ALJ failed to reevaluate the medical source opinions of record and the plaintiff's limitations as instructed in the court's remand order. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

14

In remanding the plaintiff's first case on the Commissioner's motion, the district court adopted the undersigned's report, which stated as follows:

> In his decision denying the plaintiff's application for disability benefits, the administrative law judge improperly evaluated the opinion of a treating physician, Dr. Kolehma (Tr. 22). Initially, the ALJ incorrectly stated that his assessment of the plaintiff's residual functional capacity was consistent, if not more restrictive, than Dr. Kolehma's conclusions about Plaintiff's functioning. The ALJ also only explicitly discounted a discrete portion of Dr. Kolehma's opinion (about the Plaintiff's ability to work on a regular and continuing basis) and did not address several specific restrictions expressed by Dr. Kolehma. Finally, the ALJ gave significant weight to the opinions of two state agency medical consultants, but their assessments were rendered two years after Dr. Kolehma's opinion, and they did not have the benefit of considering the more recent medical evidence or Dr. Kolehma's conclusions. Therefore, the defendant contends, and this court agrees, that remand is necessary for proper evaluation of the medical source opinions and reevaluation of the plaintiff's limitations.

(Tr. 475-476). Upon remand by the court, the Appeals Council issued an order remanding the case to an ALJ with instructions to take action and issue a decision (Tr. 479-80). *See* 20 C.F.R. § 416.1483. Accordingly, the ALJ was required to "take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." *Id.* § 416.1477(b). In the order remanding the case to the ALJ, the Appeals Council directed the ALJ to:

> Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence in support of assessed limitations . . . . In so doing, evaluate the treating and non-treating source opinion[s] . . . and explain the weight given to such opinion evidence. . . .

(Tr. 480).

The parties disagree as to whether this court's review should extend to a review of whether the ALJ's decision complies with the court's and/or Appeals Council's remand orders (def. brief at 11-12; pl. reply at 4) (both citing cases)). However, the

Supreme Court of the United States has stated, albeit in *dicta*, that "[d]eviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989). *See Hardy v. Astrue*, C.A.. No. 6:10-cv-2972-DCN, 2012 WL 1032740 (D.S.C. March 27, 2012) (noting that magistrate judge "should have considered whether the ALJ complied with the previously-filed R&R and this court's subsequent order adopting the R&R and remanding to the ALJ.") (citing *Sullivan*, 490 U.S. at 886).

In the decision at issue here, the ALJ[3] found as follows:

> I accord less than controlling weight to Dr. Kolehma's opinion from August 2008 that the claimant is not capable of working an 8-hour day, 5 days a week (Exhibit 10F). The treating physician's opinion is more a vocational opinion than a medical opinion and thus is not given great weight.
>
> Dr. Kolehma's opinion is not supported by the findings of her own treatment notes which document muscle spasms, decreased sensation in a C5-6 distribution on the left, and decreased cervical range of motion (Exhibit 11F). The weight accorded this opinion is also weakened by Dr. Kolehma's own notations that the claimant was not receptive to treatment recommendations and did not follow through with her recommendations. Specifically, in March 2007, Dr. Kolehma noted that [t]he claimant declined interest in receiving injections or physical therapy to treat this condition. In July 2008, she also noted that her examination of the claimant was difficult as the claimant was not fully participating in the exam. Although Dr. Kolehma recommended an updated MRI in July 2008, the claimant testified that she did not follow through with this recommendation (Exhibit 11F). These observations, as well as the fact that Dr. Kolehma did not see the claimant for 16 months between 2007 and the date of her Physical Capacity Evaluation, detract from Dr. Kolehma's assessment of the claimant's physical limitations. Rather, the doctor's assessment appears to be based primarily on the claimant's subjective symptoms.
>
> Further, this opinion is not supported by the objective evidence of record. No surgery has been recommended. An MRI

---

[3]A different ALJ had the case on remand.

revealed only mild degenerative disc disease of the cervical spine (Exhibit 1F). The most recent EMG/nerve conduction studies failed to reveal evidence of radiculopathy, carpal tunnel syndrome, or peripheral neuropathy (exhibit 11F). In October 2011, the claimant's cervical radiculopathy was assessed as stable (Exhibit 11F). In October 2011, the claimant's cervical radiculopathy was assessed as stable (Exhibit 13F). In January 2013, exam revealed normal muscle tone and coordination. Neurological exam was intact (Exhibit 16F). Nevertheless, while I do not accord controlling weight to Dr. Kolehma's conclusion that the claimant was unable to perform any work, I note that the residual functional capacity referenced above is consistent (if not more restrictive than) with her conclusions regarding the amount the claimant can sit, stand, walk, climb, crawl, and reach overhead.

Regarding the medical opinions of the DDS medical consultants set for the in Exhibits 4F, 8F, and 9F, I accord them significant weight as their opinions are generally consistent with the objective evidence of record throughout the entire period in issue.

(Tr. 423).

The undersigned agrees with the plaintiff that the ALJ failed to properly reevaluate Dr. Kolehma's and the state agency physicians' opinions as instructed in the court's remand order and that such is reversible error. Notably, the *Commissioner* moved for remand in the plaintiff's previous case and set out the errors in the previous ALJ's decision in the motion to remand (*see Taylor v. Astrue*, C.A. No. 6:11-1148-SB-KFM, doc. 25-1, m. to remand), which the court then adopted in the report and recommendation and order. Upon remand, the second ALJ also failed to address "several specific restrictions assessed by Dr. Kolehma" (Tr. 475) specifically, the plaintiff's limitations with regard to lifting (up to ten pounds, rarely),[4] walking (two hours out of an eight-hour day, 30 minutes at any one time), standing (four hours out of an eight-hour day, one hour at any one time),

---

[4]The ALJ found the plaintiff could frequently lift/carry ten pounds and occasionally lift/carry twenty pounds (Tr. 420).

17

overhead reaching (never), extension and twisting of her neck (should avoid), and bending, squatting, and kneeling (occasional) (Tr. 353-55).

Furthermore, the ALJ upon remand repeated the first ALJ's incorrect statement that the RFC assessment was "consistent (if not more restrictive than) with [Dr. Kolehma's] conclusions regarding the amount the claimant can sit, stand, walk, climb, crawl, and reach overhead" (Tr. 423). Rather, the ALJ found that the plaintiff could sit, stand, and walk each for six hours out of an eight-hour day and could occasionally perform overhead reaching, which is *less* restrictive than Dr. Kolehma's findings as set forth above[5] (Tr. 420; *see also* Tr. 353-55). While the ALJ may have good reasons for discounting these portions of Dr. Kolehma's findings, he has not stated what those reasons are with citation to record evidence as set out in the remand order.

Moreover, the remand order noted that the first ALJ gave significant weight to the opinions of two state agency physicians who gave their opinions two years prior to Dr. Kolehma's opinion and who did not have the benefit of the most recent medical evidence or Dr. Kolehma's opinion (Tr. 475, R&R adopted by order). The first ALJ stated that the decisions were "generally consistent with the other evidence of record" (Tr. 22). Following remand in the decision at issue here, the second ALJ also gave these opinions significant weight, finding they were "generally consistent with the objective evidence of record throughout the entire period in issue" (Tr. 423). Again, while the ALJ may have good reasons for finding that the opinions of the state agency physicians should not be discounted based on the issues pointed out in the remand order, he has not stated what those reasons are with citation to record evidence as set out in the remand order.

Based upon the foregoing, the undersigned recommends that the instant case be remanded for further administrative action. Specifically, the ALJ should be directed to

---

[5]The ALJ's finding that the plaintiff could never climb or crawl is consistent with Dr. Kolehma's opinion (Tr. 354, 423).

(1) address the particular restrictions assessed by Dr. Kolehma that have been discounted, giving the reasons for discounting the limitations along with references to supporting evidence of record, and (2) explain the reasons for giving the opinions of the state agency physicians significant weight, using the factors set forth in 20 C.F.R. § 416.927(c)(1)-(6), citing supporting evidence of record, and taking into consideration that the opinions were given two years prior to Dr. Kolehma's opinion and were made without the benefit of the most recent medical evidence.

The plaintiff argues that "remand for any purpose other than an award of benefits would be improper in this case" given that she applied for disability benefits over nine years ago and that the previous case was remanded (pl. brief at 18-19). The undersigned disagrees. Before a definitive decision can made on the plaintiff's claim, an appropriate review and analysis must be made of the evidence and of the plaintiff s claims by the ALJ before the court can reach a decision on whether substantial evidence supports the decision rendered. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir.2000) (noting that when the court finds the Commissioner's denial of benefits to be improper, the court's "abundant deference to the ALJ" cautions in favor of remand, and entering an immediate finding of disability is appropriate only if the record "overwhelmingly supports" such a finding); *Crider v. Harris*, 624 F.2d 15 (4th Cir.1980) (finding remand for an award of benefits was warranted where the individual's entitlement to benefits was "wholly established" on the state of the record); *Timmerman v. Comm'r of Social Security*, C.A. No. 2:07–3745–HFF–RSC, 2009 WL 500604 (D.S.C. Feb.26, 2009) (observing that factors in deciding whether to remand for consideration of additional evidence or for an award of benefits include: that deference cautions in favor of remand, plaintiff's court submissions include requests that the matter be remanded, and when evidence in the record does not overwhelmingly support a finding of disability). While the court certainly sympathizes with

the plaintiff given the length of time since she applied for benefits, reversal with a remand for payment of benefits is not warranted here.

Because the undersigned finds that remand is warranted based upon the ALJ's failure to reevaluate the medical source opinions as required in the previous remand order, the plaintiff's additional allegations of error will not be addressed. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the Commissioner should take into consideration the plaintiff's remaining allegations of error, including that the ALJ erred in failing to include all of the plaintiff's limitations in the hypothetical question posed to the vocational expert and in finding that there are a significant number of jobs in the national economy that the plaintiff can perform.

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

November 23, 2015
Greenville, South Carolina

20